**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAWN GUTHRIE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:20-CV-2351 |
| JOHN WETZEL, Secretary of the | ) | |
| Pennsylvania Department of Corrections;; | ) | **FILED ELECTRONICALLY** |
| DR. PAUL NOEL, former Chief of | ) | |
| Clinical Services; DR. ARLENE SEID, | ) | **JURY TRIAL DEMANDED** |
| Chief of Clinical Services;  DR. PALUKI | ) | |
| REDDY, Chief of Psychiatric Services. | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff Dawn Guthrie is a 46-year-old transgender woman[1] currently

incarcerated at the State Correctional Institution at Mahanoy, a men's prison

operated by the Pennsylvania Department of Corrections. In 1998, she was

diagnosed with gender dysphoria, a serious medical condition characterized by

strong cross-gender identification.[2] Individuals with gender dysphoria experience

---

[1] In following with Ms. Guthrie's gender identity, modern judicial practice, and accepted medical protocols, this Complaint uses female pronouns to refer to Ms. Guthrie and does not use her deadname under which she is incarcerated.

[2] Gender dysphoria is the current term for what was previously identified as "Gender Identity Disorder," or GID. The name was changed to remove the stigma and pathology associated with being transgender, and to shift focus onto the psychological stress that occurs when cross-gender association is not properly facilitated or managed.

extreme distress related to their gender expression. Ms. Guthrie has lived fully as a woman since 2016, and she has been on hormone therapy since May of 2017. However, she still experiences severe gender dysphoria related distress and requires additional treatment through, among other accommodations, gender affirmation surgery.

As a consequence of her gender dysphoria, Ms. Guthrie has experienced suicidal ideation throughout her life and has a documented risk of self-harm in the form of autocastration. Medical and psychology personnel in the DOC have consistently approved and recommended Ms. Guthrie for gender affirmation surgery. Despite these serious indicators and recommendations by its own health care professionals, the DOC continues to violate the Eighth Amendment to the U.S. Constitution by refusing to provide Ms. Guthrie with adequate care for her gender dysphoria, including gender affirming surgery. The DOC's refusal to provide Ms. Guthrie with this medically necessary care has caused her severe pain and anguish and places her at a substantial risk of future injury.

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution.

2.     This Court has jurisdiction under 28 U.S.C. § 1331, 1343(a)(3)-(4) over the Constitutional claims, as well as those arising under 42 U.S.C. § 1983.

3.     This Court is the appropriate venue under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to this action occurred in Schuylkill County, Pennsylvania within the Middle District of Pennsylvania.

## PARTIES

4.     Plaintiff Dawn Guthrie is a 46-year-old transgender woman currently incarcerated at the State Correctional Institution ("SCI") Mahanoy, a medium-security level facility for men operated by the Pennsylvania Department of Corrections ("DOC").

5.     Defendant John E. Wetzel is, and was at all times relevant to this Complaint, the Secretary of Corrections for the DOC. He maintains an office in Mechanicsburg, Pennsylvania.  Defendant Wetzel is responsible for the oversight, operation, and administration of the Commonwealth's correctional system including implementation of training and policies regarding access to health care and policies relating to transgender and gender nonconforming individuals. He is being sued in his individual and official capacities.

6.     Defendant Dr. Paul Noel was an employee of the DOC serving as the Chief of Clinical Services for the DOC. Defendant Noel was responsible for the oversight, operation, and administration of healthcare within the Commonwealth's correctional system including the implementation of training and policies regarding the provision of transgender healthcare and gender affirming surgery. He is being sued in his individual capacity.

3

7.     Defendant Dr. Paluki Reddy is an employee of the DOC serving as the Chief Psychiatrist for the DOC.  Defendant Reddy is responsible for the oversight, operation, and administration of mental healthcare within the Commonwealth's correctional system, including the implementation of training and policies regarding the provision of transgender mental healthcare and gender affirming surgery.  He is being sued in his individual and official capacities.

8.     Defendant Dr. Arlene Seid is an employee of the DOC serving as the Chief of Clinical Services for the DOC. Defendant Seid is responsible for the oversight, operation, and administration of healthcare within the Commonwealth's correctional system including the implementation of training and policies regarding the provision of transgender healthcare and gender affirming surgery. She is being sued in her official capacity.

## FACTUAL BACKGROUND

9.     Plaintiff Dawn Guthrie has been incarcerated within the Pennsylvania Department of Corrections ("DOC") since September 17, 2013.   Her DOC identification number is MQ7942.

10.    She is currently incarcerated at SCI Mahanoy, a men's prison.

11.    Ms. Guthrie was assigned the sex of male at birth.

12.    Ms. Guthrie is a transgender woman. She has identified with the female gender since she was 8 years old. She lived in the closet most of her life out of fear for her safety, living as a man during the day and a woman at night.

4

13.     Ms. Guthrie has lived fully as a woman since 2016.

14.     Ms. Guthrie was diagnosed with Gender Dysphoria in 1998.

15.     The DOC affirmed her diagnosis in February 2016.

16.     The DOC officially recognized Ms. Guthrie's gender as female on December 1, 2017 through a Letter Certifying Applicant's Gender Change.

17.     Despite this, Ms. Guthrie has spent the majority of her incarceration in various men's prisons.

18.     Ms. Guthrie was briefly incarcerated at SCI Muncy, a women's prison, from March 27, 2019 until August 2019, when she was transferred to SCI Mahanoy, after receiving a misconduct.

19.     Upon information and belief, Ms. Guthrie's transfer out of SCI Muncy was authorized by Secretary Wetzel and members of the Gender Review Committee.

**A.   Gender Dysphoria is Recognized as a Serious Medical Condition Requiring Treatment**

20.     An individual's gender identity refers to that person's innermost feelings of belonging to a particular gender. It is a central component of a person's social identity. Transgender individuals experience a different gender identity from the physical sex characteristics with which they were born.

21.     Gender dysphoria is a diagnosable and treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), as well as the International Classification of Disease-10 (World Health Organization).

22.     Gender dysphoria is not a mental illness or disorder. Rather, gender dysphoria is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex.

23.     When gender dysphoria is severe, it can result in a person's inability to function in everyday life.

24.     Gender dysphoria is highly treatable; with appropriate treatment, individuals with gender dysphoria can be fully cured of all symptoms.

25.     When not properly treated, gender dysphoria often results in suicidal ideation, self-mutilation, substance abuse, depression, aggression, and ultimately suicide.

26.     Without treatment, the experience for those suffering from gender dysphoria can be torturous, as evidenced by alarmingly high suicide and suicide attempt rates. For example, 40 percent of persons identifying as transgender have attempted suicide in their lifetime, nearly 9 times the national average of 4.6 percent. Seven percent of persons identifying as transgender attempted suicide in the past year, nearly 12 times the national average of 0.6%.[3]

27.     Symptoms of gender dysphoria are exacerbated in the prison environment because of the extreme limitations this setting has on allowing an

---

[3] 2015 National Transgender Discrimination Survey (2015), https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

individual to live and be treated as their gender of identification.

28.    In institutions, transgender individuals also experience extreme levels of physical, sexual, and emotional abuse. Nearly a quarter of transgender individuals arrested within the last year, were physically assaulted by staff or other inmates; one in five were sexually assaulted. Transgender people are over five times more likely to be sexually assaulted by institutional staff, and over nine times more likely to be sexually assaulted by other incarcerated people.

29.    Ms. Guthrie's history evidences the typical experience of transgender individuals both in relation to comorbid conditions and experienced abuse. Ms. Guthrie has a history of a suicide attempt, repeated suicidal ideation, depression, ideation about autocastration, physical and sexual assault, and persistent sexual harassment.

**B.    Gender Affirming Surgery is a Medically Necessary Intervention that People Suffering from Gender Dysphoria Have a Right to Access**

30.    The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. It consists of physicians and other health care professionals specializing in treatment of gender dysphoria. WPATH publishes the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* ("Standards of Care"). The Standards of Care were first developed in 1979.

31.    WPATH's Standards of Care are the prevailing standards of care used

by mental health providers and medical professionals treating gender dysphoria.

32.   In promulgating the Standards of Care, the WPATH specifies that they "apply to all transsexual, transgender, and gender nonconforming people, irrespective of housing situation, including in institutional environments such as prisons."

33.   The Standards of Care further state that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions . . . If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."

34.   The goals of medical treatments for gender dysphoria, as stated in the Standards of Care are: (1) to alleviate clinically significant distress and impairment of functioning associated with gender dysphoria, and (2) to maximize overall psychological well-being.

35.   As recognized by both the DSM-V and the Standards of Care, people with gender dysphoria who do not receive appropriate medical treatment are at risk of depression, anxiety, suicide, and genital self-mutilation, including attempts at performing auto-castrations or auto-penectomy which can lead to serious and life-threatening injuries.

36.   After a diagnosis of gender dysphoria is made, the Standards of Care

requires that a competent medical professional with knowledge and expertise in gender dysphoria evaluate a patient for appropriate and necessary treatment options.

37.     The Standards of Care sets forth treatment options for gender dysphoria, including: changes in gender expression and role (which may involve living part-time or full-time in another gender role, consistent with one's gender identity); hormone therapy to feminize or masculinize the body; surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring); and psychotherapy addressing the negative impact of gender dysphoria and stigma on mental health, alleviating internalized transphobia, enhancing social and peer support, improving body image, or promoting resilience.

38.     The Standards of Care also note that additional changes in gender expression such as hair removal and changes in name and gender markers on identification documents can be considered to help alleviate gender dysphoria. The more an individual can live, express themselves, and be treated as their gender of identification, the less they experience gender dysphoria.

39.     The Standards of Care indicate that gender affirming surgery can be considered after an individual has lived for at least 12 months without alleviation of gender dysphoria distress symptoms.

40.     Other criteria for surgery include "persistent, well-documented gender dysphoria; capacity to make a fully informed decision and to consent for treatment;"

age of majority; and 12 continuous months of hormone therapy.

41.    The Standards of Care make clear that gender affirmation surgery is not an "elective procedure." Gender affirmation surgery is an "essential and medically necessary treatment to alleviate gender dysphoria in some cases. Hormone therapy alone for these individuals is not sufficient.

42.    The WPATH Standards of Care recognize auto-castration as an attempt at "self-treatment" for gender dysphoria.  Auto-castration comes with severe risks including death due to blood loss.

43.    Auto-castration has been studied as a significant occurrence among transgender individuals who are incarcerated and are prevented from accessing treatment for gender dysphoria.[4]

44.    The National Commission on Correctional Health Care ("NCCHC"), which sets standards and provides accreditation for prisons throughout the nation, recognizes that the Standards of Care should be followed by correctional institutions in providing healthcare to transgender people.[5]

45.    The NCCHC acknowledges that decisions on transgender health care

---

[4] *See* George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder,"* International Journal of Transgenderism, 12:31, 30 (2010).

[5] NCCHC Position Statement: Transgender, Transsexual and Gender Nonconforming Health Care in Correctional Settings (2015) *available at* https://www.ncchc.org/transgender-transsexual-and-gender-nonconforming-health-care.

must be made on an individualized case by case basis.

46.     The NCCHC recommends that correctional health staff be trained in transgender heath care and notes that in the alternative, incarcerated people should "have access to other professionals with expertise in transgender health care to help determine appropriate management."

**C.     DOC's Policy Regarding Treatment of Gender Dysphoria is Constitutionally Inadequate and Discriminatory**

47.     DOC Policy Statement 13.2.1, Access to Health Care, is the DOC's policy that establishes the procedures by which the DOC and medical vendor staff provide access to health care.

48.     Section 19 of Policy 13.2.1 identifies the WPATH Standards of Care as the relevant guidelines for the overall health care of individuals with gender dysphoria.

49.     Section 19 of Policy 13.2.1 addresses the treatment of gender dysphoria and "establishes procedures to appropriately diagnose, treat, and manage [people] with Gender Dysphoria (GD) consistent with the core values and mission of the Pennsylvania Department of Corrections."

50.     The DOC Standards of Care require that should hormone therapy fail to alleviate symptoms of gender dysphoria, an incarcerated person should be immediately referred to the Gender Dysphoria Treatment Review Committee for further treatment, such as gender affirming surgery.

51.     According to Section 19, Defendants Noel and Seid, as the former and current Chiefs of Clinical Services, have the "overall responsibility for the medical treatment of inmates diagnosed with GD."

52.     Likewise, Defendant Reddy, as the Chief Psychiatrist, has the "overall responsibility for the mental health diagnosis and treatment of inmates diagnosed with [Gender Dysphoria]."

53.     Pursuant to Section 19, the contracted medical and mental health vendors must provide training to their practitioners on "evaluation, treatment and management of patients with [Gender Dysphoria]" with annual refresher training.

54.     Defendants Noel, Seid, and Reddy must pre-approve this training.

55.     Section 19 establishes a "GD Treatment Review Committee" which *inter alia*, establishes DOC policy, reviews and approves every individual treatment plan, and reviews all requests for gender affirming surgery.

56.     The GD Treatment Review Committee is made up of at least six people, none of whom are medical professionals involved in the direct care of gender dysphoria identified persons. Further, upon information and belief, none specialize in transgender issues or treatment.

57.     As the Chiefs of Clinical Services and Chief Psychiatrist, Defendants Noel, Seid and Reddy are required members of this Committee.

58.     Psychology staff and the prison's psychiatrist can develop a Gender Dysphoria Individual Recovery Plan ("IRP") for each person with GD; however

Section 19 requires that the GD Treatment Review Committee unanimously sign off on the treatment plan.

59.     All treatment beyond the initial IRP must also be unanimously approved by the GD Treatment Review Committee.

60.     Section 19 specifically identifies that the Committee, as opposed to any staff actually providing direct medical or mental health care to the patient with gender dysphoria, renders the decision as to whether the person can be referred to an outside specialist for evaluation for continued treatment through gender affirming surgery.

61.     If the outside specialist recommends gender affirming surgery as a necessary treatment, the case is then referred to a separate "larger" Department Central Office Gender Review Committee ("GRC").

62.     Pursuant to DOC policy, even once gender affirming surgery has been deemed medically necessary by a specialist, the GRC makes the ultimate decision as to whether a person with gender dysphoria should receive this crucial care.

63.     Upon information and belief, the GRC consists solely of individuals who work in the DOC's central office in Mechanicsburg, PA.

64.     Upon information and belief, the GRC includes non-medical staff, such as administrative and security personnel.

65.     The GRC has never approved critical gender affirming surgery for any transgender persons incarcerated by the DOC.

66.     Upon information and belief, medical and mental health staff who have or are providing direct care to the individual with gender dysphoria do not sit on, or have a vote in, the GRC.

67.     There is no medical justification for a policy requiring that necessary medical care be approved by administrative committees, particularly committees consisting of individuals not directly involved in the treatment of the person in need of care.

68.     People with gender dysphoria are the only people the DOC subject to a policy requiring an extensive committee review process to determine, and ultimately deny, necessary medical care as recommended by a specialist.

69.     As the Secretary of the Department of Corrections, Defendant Wetzel reviews and approves all DOC policies, including DOC Policy Statement 13.2.1.

70.     Defendant Wetzel has the ability to suggest and implement changes and revisions to DOC policies.

71.     Defendant   Wetzel   was   involved   in   the   development   and implementation of DOC policies relating to the safety and care of transgender people in DOC custody, including several one-on-one meetings with Commonwealth and DOC officials.

**D.     Defendants Have Demonstrated Deliberate Indifference to Ms. Guthrie's Serious Medical Needs**

72.     Ms. Guthrie   has   experienced   prolonged   and   persistent   depression,

anxiety, and trauma related to her gender dysphoria.

73.    Ms. Guthrie has a lengthy history of past suicidal ideation and at least one suicide attempt prior to incarceration.

74.    Ms. Guthrie shared her history of depression and suicidal ideation with DOC staff upon entering the DOC.

75.    Throughout her incarceration in the DOC, medical and psychological staff have informed Ms. Guthrie that they were not fully familiar with the WPATH Standards of Care.

76.    Each prison that Ms. Guthrie has been housed at has lacked on-site medical staff and/or specialists versed in transgender healthcare.

77.    Ms. Guthrie has not been allowed to meet with an outside specialist while incarcerated in the DOC to discuss her need for gender affirming surgery or other transgender healthcare needs.

78.    Ms. Guthrie began taking hormone replacement therapy intermittently prior to her incarceration.

79.    Ms. Guthrie began seeking hormone replacement therapy from DOC medical staff in February 2016, soon after she learned it was a treatment the DOC could provide.

80.    The DOC took over a year, until May 2017, to approve Ms. Guthrie for hormone replacement therapy.

81.    Despite undergoing hormone therapy for over three years, Ms. Guthrie

continues to suffer severe gender dysphoria and distress around her gender presentation.

82.     Ms. Guthrie's mental health providers have consistently recommended that she be given gender affirming surgery based on her feelings of gender dysphoria, depression, isolation, and thoughts of self-harm and suicide.

83.     With the support of her direct care providers, Ms. Guthrie requested gender affirming surgery on January 18, 2018.

84.     This request was forwarded to Defendant Noel on the same day.

85.     On April 5, 2018, Ms. Guthrie requested laser hair removal for her face, a common element of transgender healthcare and treatment for gender dysphoria.

86.     Medical staff denied this request, deeming the procedure purely "cosmetic."

87.     Ms. Guthrie has been permitted to use a razor to shave; however, the razor is taken from her regularly and she often does not have daily access.

88.     Ms. Guthrie was approved by Central Office to be prescribed a medical issue shaver as a permanent issued assistive device to alleviate the pain and irritation from constant shaving.

89.     The razor is documented in her medical records as a healthcare item.

90.     In November 2019, Ms. Guthrie's medical issued shaver stopped working. She took it to medical to acquire a new one. She was told a request was submitted.

91.   In February 2020, she had still not received a razor. The Corrections Healthcare Administrator at SCI Mahanoy then told her that the razor "service" was not offered at SCI Mahanoy because it was a security issue. He refused to issue her a functioning medical issue shaver.

92.   As a result, Ms. Guthrie has experienced serious physical discomfort and worsening of her GD symptoms.

93.   Defendants have been in possession of Ms. Guthrie's birth certificate certifying her as female since August 20, 2018.

94.   Despite this, staff routinely call Ms. Guthrie "it," and use incorrect pronouns with Ms. Guthrie in person and in administrative documents.

95.   Ms. Guthrie repeatedly reiterated her request for gender affirmation surgery through administrative and mental health channels throughout 2018 and 2019.

96.   Every time Ms. Guthrie inquired into the status of her request for gender affirmation surgery, she was informed by various prison officials that the decision was being considered by the central office.

97.   Ms. Guthrie's requests for gender affirming surgery were ultimately denied on June 10, 2019.

98.   Ms. Guthrie was not provided any rationale for the denial.

99.   Since 2018, Ms. Guthrie's mental health providers have regularly documented Ms. Guthrie's growing risk of attempting autocastration.

100. Ms. Guthrie's gender dysphoria symptoms have consistently increased while in a men's facility and pose a serious threat to her physical safety and well-being.

101. Her psychological distress is so great that she now showers with her underwear on so that she doesn't have to look at herself.

102. Staff periodically prevent Ms. Guthrie from expressing her gender identity by not allowing her access to female commissary items.

103. Mental health providers have documented suicidal ideation in Ms. Guthrie's chart throughout 2018 and 2019 on multiple occasions.

104. From July 20, 2019 through July 24, 2019, Ms. Guthrie had to be put on Constant Watch, the closest level of monitoring for DOC inmates experiencing acute suicidal ideation.

105. Defendants do not deny that Ms. Guthrie has gender dysphoria which requires treatment.

106. However, despite knowing that she continues to endure severe psychological distress and is at risk of serious injury or death as a result of her gender dysphoria, Defendants have time and again denied her critical care.

107. Defendants Wetzel, Noel, Reddy and Seid are responsible for the denials of Ms. Guthrie's requests for access to a gender specialist, hair removal, and gender affirming surgery and the ongoing inadequate care she is receiving for her gender dysphoria.

18

## CAUSE OF ACTION

### COUNT I -
### Deprivation of Eighth Amendment Right to Be Free from Cruel and Unusual Punishment
### (Against All Defendants)

108.   The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

109.   Defendants violated Ms. Guthrie's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution through their deliberate indifference to her serious medical needs, including but not limited to their failure to provide her access to a transgender health specialist, gender affirming surgery and other necessary medical care.

110.   Defendants have further violated Ms. Guthrie's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution through their deliberate indifference to her serious medical needs by their interference with her attempts to socially transition including but not limited to denial of access to female commissary items and transferring her out of a women's prison.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Guthrie requests that the Court grant the following relief:

1.      A declaratory judgment that Defendants violated Ms. Guthrie's rights under the Eighth Amendment;

2.      Injunctive relief requiring Defendants allow Ms. Guthrie access to an outside transgender healthcare specialist;

3.      Injunctive relief requiring Defendants provide Ms. Guthrie with necessary medical care for her gender dysphoria including but not limited to permanent hair removal, and gender affirming surgery after consultation with a transgender healthcare specialist;

4.      Injunctive relief requiring Defendants provide adequate training on the Standards of Care to all staff providing medical or mental health treatment to transgender individuals;

5.      Injunctive relief requiring Defendants allow Ms. Guthrie to fully socially transition by allowing her access to female commissary items and transferring her to a women's prison;

6.      Injunctive relief requiring Defendants Wetzel, Seid and Reddy to enact and enforce more appropriate policies to utilize direct care providers and specialists in transgender healthcare in assessing a gender dysphoria identified person's treatment plan, including but not limited to access to gender affirming surgery.

7.      An award of appropriate compensatory and punitive damages against Defendants in favor of Ms. Guthrie in an amount to be determined by the finder of fact;

8.    Reasonable attorney's fees and costs; and

9.    Such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Alexandra Morgan-Kurtz*
PA ID No. 312631
PA INSTITUTIONAL LAW PROJECT
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

*/s/ Amy B. Ernst*
PA ID No. 328055
PA INSTITUTIONAL LAW PROJECT
115 Farley Circle, Suite 110
Lewisburg, PA 17837
T: (570) 523-1104
aernst@pailp.org\